**LABATON SUCHAROW LLP**
Francis P. McConville
*(pro hac vice forthcoming)*
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
fmcconville@labaton.com

***Counsel for Plaintiffs***

*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Oakland County Voluntary Employees' Beneficiary Association, and the Oakland County Employees' Retirement System, Individually and on Behalf of All Others Similarly Situated, | No. |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| Opendoor Technologies Inc., Eric Wu, Carrie Wheeler, Chamath Palihapitiya, Steven Trieu, Ian Osborne, Adam Bain, David Spillane, Cipora Herman, Pueo Keffer, Glenn Solomon, Jason Kilar, Jonathan Jaffe, Citigroup Global Markets Inc., Goldman Sachs & Co. LLC, Barclays Capital Inc., Deutsche Bank Securities Inc., Oppenheimer & Co. Inc., BTIG, LLC, KeyBanc Capital Markets Inc., Wedbush Securities Inc., TD Securities (USA) LLC, Zelman Partners LLC, Academy Securities, Inc., Loop Capital Markets LLC, Samuel A. Ramirez & Company, Inc., Siebert Williams Shank & Co., LLC, and SVF Excalibur (Cayman) Limited, | CLASS ACTION  (DEMAND FOR JURY TRIAL) |
| Defendants. | |

# TABLE OF CONTENTS

**PAGE**

SUMMARY AND OVERVIEW ........................................................................1

NATURE OF THE ACTION ..........................................................................1

JURISDICTION AND VENUE .......................................................................5

PARTIES .........................................................................................................6

    Plaintiffs.....................................................................................................6

    Exchange Act Defendants ........................................................................6

    Securities Act Defendants ........................................................................7

COMPANY BACKGROUND .......................................................................12

SUBSTANTIVE ALLEGATIONS-EXCHANGE ACT CLAIMS...........................13

    Opendoor Issues Materially False and Misleading Statements.........................13

    Opendoor's Misrepresentations Begin to Come to Light As Opendoor Issues Further Materially False and Misleading Statements.............................16

    The Truth Behind Opendoor's Misrepresentations Are Further Revealed.......21

    Additional Scienter Allegations Related to Exchange Act Claims..................22

    Loss Causation/Economic Loss...........................................................23

    Applicability of Presumption of Reliance: Fraud on the Market.....................23

    No Safe Harbor .......................................................................................24

COUNT I  For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants..................25

COUNT II  For Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants................................................................28

SUBSTANTIVE ALLEGATIONS – SECURITIES ACT CLAIMS .........................29

    Materially False and Misleading Statements Issued in the December 2020 Offering Documents ........................................................................29

Materially False and Misleading Statements in the February 2021 SPO Documents ............................................................................................30

Materially False and Misleading Statements in the September 2021 SPO Documents ............................................................................................31

Statements in the Offering Documents Were Materially False and Misleading ...............................................................................................31

The Falsity of Opendoor's Misrepresentations Begin to Come to Light in February of 2022 ...............................................................................32

Material Misrepresentations and Omissions Contained in the Offering Documents Were Further Revealed in September of 2022 ......................33

COUNT III  For Violations of Section 11 of the Securities Act Against Opendoor, the Securities Act Individual Defendants, and the Underwriter Defendants ........................................................................34

COUNT IV  For Violations of Section 12(a)(2) of the Securities Act Against Opendoor, the SPO Individual Defendants, SVF, and the Underwriter Defendants ......................................................................................35

COUNT V  For Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants,.................................................37

PLAINTIFFS' CLASS ACTION ALLEGATIONS .................................................38

PRAYER FOR RELIEF .........................................................................................39

DEMAND FOR TRIAL BY JURY ........................................................................40

## SUMMARY AND OVERVIEW

Plaintiffs Oakland County Voluntary Employees' Beneficiary Association and the Oakland County Employees' Retirement System (collectively "Oakland County" or the "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' (as defined herein) public documents, conference calls and announcements made by Defendants (as defined herein), United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Opendoor Technologies Inc. ("Opendoor" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.   Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants (as defined herein) that purchased or otherwise acquired: (a) Opendoor securities between December 21, 2020 and September 16, 2022, both dates inclusive (the "Class Period"); (b) Opendoor common stock pursuant and/or traceable to the December 2020 Offering Documents (defined below) issued in connection with the business combination between the Company and Opendoor Labs Inc. ("Legacy Opendoor") completed on or about December 18, 2020 (the "Merger"); (c) Opendoor common stock pursuant and/or traceable to the  February 2021 SPO Documents (defined below) issued in connection with the Company's secondary public offering that was completed on or about February 9, 2021; and/or (d) Opendoor common stock pursuant and/or traceable to the September 2021 SPO

Documents (defined below) issued in connection with the Company's secondary public offering that was completed on or about September 17, 2021. Plaintiffs pursue claims against the Defendants (as defined herein) under the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act").

2.     Opendoor was formerly known as Social Capital Hedosophia Holdings Corp. II ("SCH") and operated as a special purpose acquisition company ("SPAC"), also called a blank-check company, which is a development stage company that has no specific business plan or purpose or has indicated its business plan is to engage in a merger or acquisition with an unidentified company or companies, other entity, or person.

3.     On September 15, 2020, the Company, then still operating as SCH, and Legacy Opendoor, a private company operating as a digital platform for residential real estate, announced their entry into a definitive agreement for the Merger (the "Merger Agreement"), which valued Legacy Opendoor at an enterprise value of $4.8 billion.

4.     On October 5, 2020, the Company filed a registration statement on Form S-4 with the SEC in connection with the Merger, which, after several amendments, was declared effective by the SEC on November 27, 2020 (the "November 2020 Registration Statement"). On November 30, 2020, the Company filed a proxy statement/prospectus on Form 424B3 with the SEC in connection with the Merger, which formed part of the November 2020 Registration Statement (the "Proxy" and, together with the November 2020 Registration Statement, the "December 2020 Offering Documents").

5.     On December 18, 2020, pursuant to the Merger Agreement, the Company deregistered as a Cayman Islands company, registered as a Delaware company, changed its name to "Opendoor Technologies Inc.," and consummated the Merger, whereby, among other things, Legacy Opendoor became a wholly owned subsidiary of the Company.

6.     Following the Merger, the Company has operated a digital platform for buying and selling residential real estate in the U.S.  The Company's platform features a technology known as "iBuying," which is an algorithm-based process that purportedly enables Opendoor to make accurate market-based offers to sellers for their homes, and then flip those homes to buyers for a profit.

7.     On December 21, 2020, the Company's post-Merger common stock and warrants began publicly trading on the Nasdaq Stock Market ("NASDAQ") under the ticker symbols "OPEN" and "OPENW," respectively.

8.     Subsequent to the Merger, the Company also completed two secondary public offerings in 2021 of its common stock (the "SPOs").

9.     In connection with a secondary public offering conducted in February of 2021 (the "February 2021 SPO"), the Company filed a registration statement on Form S-1 which was declared effective by the SEC on February 4, 2021 (the "February 2021 Registration Statement").  The Company also filed with the SEC a prospectus related to the offering on Form 424B4 on February 8, 2021 (with the February 2021 Registration Statement, the "February 2021 SPO Documents").  Pursuant to the February 2021 SPO Documents, the Company offered for sale a total of 32,817,421 shares of its common stock.  This offering was completed on February 9, 2021.  The shares were sold to the public at an offering price of $27.00 per share.  Through sales of common stock, the February 2021 SPO generated approximately $886 million in gross proceeds, and the Company received proceeds from the February 2021 SPO of approximately $859.5 million (net of underwriting discounts and commissions).

10.     In connection with a secondary public offering conducted in September of 2021 (the "September 2021 SPO"), the Company filed registration statement on Form S-1 on December 21, 2020, which was declared effective by the SEC on March 12, 2021 (the "March 2021 Registration Statement").  The Company also filed with the SEC a prospectus supplement related to the offering on Form 424B3 on September 15, 2021 on Form 424B3 which amended and supplemented the prospectus the Company

filed dated March 12, 2021 (with the March 2021 Registration Statement, the "September 2021 SPO Documents") and, together with the February 2021 SPO Documents and the December 2020 Offering Documents, the "Offering Documents"). Pursuant to the September 2021 SPO Documents, a major stockholder of Opendoor, SVF Excalibur (Cayman) Limited ("SVF" or "Selling Stockholder") offered for sale a total of 32,200,000 shares of Opendoor common stock. These shares were sold to the public at a price of $16.69 per share, generating a total of approximately $537 million. The September 2021 SPO was completed on September 17, 2021.

11. The December 2020 Offering Documents, the February 2021 SPO Documents, and the September 2021 Offering documents are sometimes collectively referred to herein as the "Offering Documents."

12. The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Additionally, throughout the Class Period, Defendants (as defined herein) made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Offering Documents contained and Defendants (as defined herein) made false and/or misleading statements and/or failed to disclose that: (i) the algorithm ("Algorithm") used by the Company to make offers for homes could not accurately adjust to changing house prices across different market conditions and economic cycles; (ii) as a result, the Company was at an increased risk of sustaining significant and repeated losses due to residential real estate pricing fluctuations; (iii) accordingly, Defendants (as defined herein) overstated the purported benefits and competitive advantages of the Algorithm; and (iv) as a result, the Offering Documents and Defendants' (as defined herein) public statements throughout the Class Period were materially false and/or misleading and failed to state information required to be stated therein.

13.     In February of 2022, Opendoor announced massive losses which began to reveal to investors that its Algorithm failed to live up to the representations Opendoor made in the Offering Documents and throughout the Class Period.  Then, on September 19, 2022, citing a review of industry data, *Bloomberg* reported that the Company appeared to have lost money on 42 percent of its transactions in August 2022 (as measured by the prices at which it bought and sold properties).  *Bloomberg* further reported that the data was even worse in key markets such as Los Angeles, California, where Opendoor lost money on 55 percent of sales, and Phoenix, Arizona, where it lost money on 76 percent of sales.  Worse, a global real estate tech strategist interviewed by *Bloomberg*, Mike DelPrete, predicted that, based on his analyses, September would likely be even worse for Opendoor than August.  *Bloomberg's* findings evidenced the failure of Opendoor's Algorithm to adjust accurately to changing market conditions.

14.     Following the *Bloomberg* report, Opendoor's stock price fell $0.50 per share, or 12.32 percent, over the following two trading sessions, to close at $3.56 per share on September 20, 2022-an ***88.61 percent*** decline from the Company's first post-Merger closing stock price of $31.25 per share on December 21, 2020 (the "Initial Closing Price").

15.     As of the time this Complaint was filed, Opendoor's common stock was trading significantly below the Initial Closing Price and continues to trade below its initial value from the Merger, damaging investors.

16.     As a result of Defendants' (as defined herein) wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections l0(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule l0b-5 promulgated thereunder by the SEC (17 C.F.R. § 240. l0b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Opendoor is headquartered in this Judicial District, Defendants (as defined herein) conduct business in this Judicial District, and a significant portion of Defendants' (as defined herein) actions took place within this Judicial District.

20.     In connection with the acts alleged in this Complaint, Defendants (as defined herein), directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

21.     Plaintiffs purchased or otherwise acquired Opendoor common stock during the Class Period, and pursuant and/or traceable to the Offering Documents and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### Exchange Act Defendants

22.     Defendant Opendoor is a Delaware corporation with principal executive offices located at 410 N. Scottsdale Road, Suite 1600, Tempe, Arizona 85281.  The Company's common stock and warrants trade in an efficient market on the NASDAQ under the ticker symbols "OPEN" and "OPENW," respectively.

23.     Defendant Eric Wu ("Wu") has served as Opendoor's Chairman of the Board of Directors and Chief Executive Officer ("CEO") at all relevant times following the consummation of the Merger.  Wu signed or authorized the signing of the February 2021 SPO Documents and the September 2021 SPO Documents filed with the SEC.

Wu consented to being named a person who would become a director of Opendoor in the December 2020 Offering Documents.

24.    Defendant Carrie Wheeler ("Wheeler") has served as Opendoor's Chief Financial Officer ("CFO") at all relevant times following the consummation of the Merger.   Wheeler signed or authorized the signing of the February 2021 SPO Documents and the September 2021 SPO Documents filed with the SEC.

25.    Defendants Wu and Wheeler are sometimes referred to herein collectively as the "Exchange Act Individual Defendants."

26.    The Exchange Act Individual Defendants possessed the power and authority to control the contents of Opendoor's SEC filings, press releases, and other market communications.  The Exchange Act Individual Defendants were provided with copies of Opendoor's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Opendoor, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

27.    Opendoor and the Exchange Act Individual Defendants are sometime referred to herein collectively as the "Exchange Act Defendants."

**Securities Act Defendants**

28.    Defendant Adam Bain ("Bain") served as a Director of Opendoor at all relevant times prior to consummation of the Merger, the February 2021 SPO, and the September 2021 SPO.  Bain signed or authorized the signing of the December 2020 Offering Documents, the February 2021 SPO Documents, and the September 2021

SPO Documents filed with the SEC.  Bain consented to being named a person who would become a director of Opendoor in the December 2020 Offering Documents.

29.    Defendant Cipora Herman ("Herman") served as a Director of Opendoor at all relevant times prior to consummation of the Merger, the February 2021 SPO, and the September 2021 SPO.  Herman signed or authorized the signing of the December 2020 Offering Documents, the February 2021 SPO Documents, and the September 2021 SPO Documents filed with the SEC.  Herman consented to being named a person who would become a director of Opendoor in the December 2020 Offering Documents.

30.    Defendant Pueo Keffer ("Keffer") served as a Director of Opendoor at all relevant times prior to each of the SPOs.  Keffer signed or authorized the signing of both the February 2021 SPO Documents and the September 2021 SPO Documents. Keffer consented to being named a person who would become a director of Opendoor in the December 2020 Offering Documents.

31.    Defendant Glenn Solomon ("Solomon"), served as a Director of Opendoor at all relevant times prior to each of the SPOs.  Solomon signed or authorized the signing of both the February 2021 SPO Documents and the September 2021 SPO Documents.  Solomon consented to being named a person who would become a director of Opendoor in the December 2020 Offering Documents.

32.    Defendant Jason Kilar ("Kilar"), served as a Director of Opendoor at all relevant times prior to each of the SPOs.  Kilar signed or authorized the signing of both the February 2021 SPO Documents and the September 2021 SPO Documents.  Kilar consented to being named a person who would become a director of Opendoor in the December 2020 Offering Documents.

33.    Defendant Jonathan Jaffe ("Jaffe"), served as a Director of Opendoor at all relevant times prior to each of the SPOs.  Jaffe signed or authorized the signing of both the February 2021 SPO Documents and the September 2021 SPO Documents. Jaffe consented to being named a person who would become a director of Opendoor in the December 2020 Offering Documents.

34.     Defendants identified in paragraphs 28-33, along with the Exchange Act Individual Defendants, are sometimes referred to herein collectively as the "SPO Individual Defendants."

35.     Defendant Chamath Palihapitiya ("Palihapitiya") served as Opendoor's CEO and Chairman of the Board of Directors at all relevant times prior to consummation of the Merger.   Palihapitiya signed or authorized the signing of the December 2020 Offering Documents filed with the SEC.

36.     Defendant Steven Trieu ("Trieu") served as Opendoor's CFO at all relevant times prior to consummation of the Merger.   Trieu signed or authorized the signing of the December 2020 Offering Documents filed with the SEC.

37.     Defendant Ian Osborne ("Osborne") served as Opendoor's President and a Director of the Company at all relevant times prior to consummation of the Merger  Osborne signed or authorized the signing of the December 2020 Offering Documents filed with the SEC.

38.     Defendant David Spillane ("Spillane") served as a Director of Opendoor at all relevant times prior to consummation of the Merger.   Spillane signed or authorized the signing of the December 2020 Offering Documents filed with the SEC.

39.     Defendants identified in paragraphs 35-38, along with the SPO Individual Defendants, are sometimes referred to herein collectively as the "Securities Act Individual Defendants."

40.     As directors, executive officers, and/or major shareholders of the Company the Securities Act Individual Defendants participated in the solicitation of Opendoor common stock in the Merger and the SPOs for their own benefit and the benefit of the Company.   Many of the Securities Act Individual Defendants were key members of the Merger working group and executives of the Company who pitched investors to approve the Merger and the shares acquired in the Merger and/or promoted the shares issued in the SPOs to investors.

41. Defendant Citigroup Global Markets Inc. is a financial services company incorporated in the state of New York and performs significant business in this District, including acting as an underwriter on both the February 2021 SPO and the September 2021 SPO.

42. Defendant Goldman Sachs & Co. LLC is a financial services company incorporated in the state of New York and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

43. Defendant Barclays Capital Inc. is a financial services company incorporated in the state of Connecticut and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

44. Defendant Deutsche Bank Securities Inc. is a financial services company incorporated in the state of Delaware and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

45. Defendant Oppenheimer & Co. Inc. is a financial services company incorporated in the state of New York and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

46. Defendant BTIG, LLC is a financial services company incorporated in the state of Delaware and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

47. Defendant KeyBanc Capital Markets Inc. is a financial services company incorporated in the state of Ohio and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

48. Defendant Wedbush Securities Inc. is a financial services company incorporated in the state of California and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

49. Defendant TD Securities (USA) LLC is a financial services company incorporated in the state of Delaware and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

50.     Defendant Zelman Partners LLC is a financial services company incorporated in the state of Delaware and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

51.     Defendant Academy Securities, Inc. is a financial services company incorporated in the state of Delaware and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

52.     Defendant Loop Capital Markets LLC is a financial services company incorporated in the state of Delaware and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

53.     Defendant Samuel A. Ramirez & Company, Inc. is a financial services company incorporated in the state of New York and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

54.     Defendant Siebert Williams Shank & Co., LLC is a financial services company incorporated in the state of Delaware and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

55.     The defendants identified in paragraphs 41-54 (collectively, the "Underwriter Defendants") served as the underwriters for the two SPOs.  Each of the Underwriter Defendants served as an underwriter for the February 2021 SPO while Citigroup Global Markets Inc. served as the sole underwriter for the September 2021 SPO.  The Underwriter Defendants' failure to conduct adequate due diligence in connection with each of the SPOs and the preparation of the February 2021 SPO Documents and the September 2021 SPO Documents was a substantial factor leading to the harm complained of herein.

56.     Defendant SVF Excalibur (Cayman) Limited is a wholly owned subsidiary of SVF Endurance (Cayman) Limited, which is a wholly owned subsidiary of SoftBank Vision Fund (AIV M1) L.P. and is incorporated in the Cayman Islands. SVF was the sole selling stockholder in the September 2021 SPO and therefore sold the shares of common stock associated with that offering.  SVF was a large shareholder

of the Company and, due to that position, exercised influence or control over the Company leading up to the September 2021 SPO.

57. Opendoor, the Underwriter Defendants, SVF, and the Securities Act Individual Defendants are sometimes referred to herein collectively, in whole or in part, as the "Securities Act Defendants."

58. The Exchange Act Defendants and the Securities Act Defendants are sometimes collectively, in whole or in part, referred to herein as "Defendants."

## COMPANY BACKGROUND

59. Opendoor was formerly known as SCH and operated as a SPAC, also called a blank-check company, which is a development stage company that has no specific business plan or purpose or has indicated its business plan is to engage in a merger or acquisition with an unidentified company or companies, other entity, or person.

60. On September 15, 2020, the Company, then still operating as SCH, and Legacy Opendoor, a private company operating as a digital platform for residential real estate, announced their entry into the Merger Agreement, which valued Legacy Opendoor at an enterprise value of $4.8 billion.

61. On October 5, 2020, the Company filed a registration statement on Form S-4 with the SEC in connection with the Merger, which, after several amendments, was declared effective by the SEC on November 27, 2020. On November 30, 2020, the Company filed the Proxy on Form 424B3 with the SEC in connection with the Merger, which formed part of the November 2020 Registration Statement.

62. On December 18, 2020, pursuant to the Merger Agreement, the Company, among other things, deregistered as a Cayman Islands company, registered as a Delaware company, changed its name to "Opendoor Technologies Inc.," and consummated the Merger, whereby, among other things, Legacy Opendoor became a wholly owned subsidiary of the Company.

63.    Following the Merger, the Company has operated a digital platform for buying and selling residential real estate in the U.S.  The Company's platform features a technology known as "iBuying," which is an algorithm-based process that purportedly enables Opendoor to make accurate market-based offers to sellers for their homes, and then flip those homes to buyers for a profit.

64.    On December 21, 2020, the Company's post-Merger common stock and warrants began publicly trading on the NASDAQ under the ticker symbols "OPEN" and "OPENW," respectively.

65.    In February of 2021, the Company offered for sale to the public a total of 32,817,421 shares of its common stock pursuant to the February 2021 SPO Documents. These shares were sold to the public at an offering price of $27.00 per share.  Through sales of common stock, the February 2021 SPO generated approximately $886 million in gross proceeds, and the Company received proceeds from the February 2021 SPO of approximately $859.5 million (net of underwriting discounts and commissions).  The February 2021 SPO was completed on February 9, 2021.

66.    In September of 2021, the Selling Stockholder offered for sale to the public a total of 32,200,000 shares of Opendoor common stock for sale pursuant to the September 2021 SPO Documents.  These shares were sold to the public at a price of $16.69 per share, generating a total of approximately $537 million.  The September 2021 SPO was completed on September 17, 2021.

**SUBSTANTIVE ALLEGATIONS-EXCHANGE ACT CLAIMS**

**Opendoor Issues Materially False and Misleading Statements**

67.    The Class Period begins on December 21, 2020, when Opendoor's post-Merger common stock began publicly trading on the NASDAQ pursuant to the materially false and misleading statements and omissions contained in the December 2020 Offering Documents.

68.     The December 2020 Offering Documents stated the following regarding Legacy Opendoor's—and, following the Merger, the Company's—proprietary Algorithm:

> While the real estate industry lends itself to the use of a plethora of publicly sourceable data, much of this data lacks the quality and specificity essential to accurately price homes. Since Opendoor's founding, we have built world-class data science capabilities and systematized tooling to gather, aggregate and synthesize an expanding catalogue of proprietary, hyperlocal data in order to improve and automate pricing decisions.

69.     With respect to the proprietary offline data used by the Algorithm, the December 2020 Offering Documents stated, in relevant part:

> We have conducted over 150,000 home assessments during which we collect over 100 data points on each home and its surroundings. We have invested in building custom inspection and operator tooling to systematically source and translate home features into a robust data library. Once we have purchased a home, we can collect additional proprietary home-level data through visitor feedback, visitor traffic and duration of visits. These proprietary data points have led us to make over one billion annotations and corrections to Multiple Listing Services ("MLS") and tax assessor data, as well as build out new, non-traditional geospatial data assets, such as power line proximity and road noise level. The additional home level data we collect from local vendors provides structured feedback on each home and further strengthens our data moat.

70.     With respect to the "pricing accuracy" of the Algorithm and its purported real-time reaction time to macro- and micro-economic conditions, the December 2020 Offering Documents stated, in relevant part:

> Our unique data works in concert with our pricing algorithms. These algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and inventory management. Over time, we have improved the pricing accuracy of our models as we add new data inputs and refine model logic, improvements that compound with experience and scale. As we have continued to demonstrate improving accuracy, we have also been able to increase our number of fully automated home valuations.
>
> Advancements in model sophistication have accelerated our feedback loops, such that our systems can dynamically adjust to leading market indicators and react to real-time

> macro- and micro-economic conditions. Our pricing algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions. This responsiveness is critical to pricing accurately and maintaining margins, especially in periods of volatility.

71.     The Class Period begins on December 21, 2020, when Opendoor's post-Merger common stock began publicly trading on the NASDAQ pursuant to the materially false and misleading statements and omissions contained in the December 2020 Offering Documents.

72.     On February 4, 2021, the Company filed with the SEC the February 2021 SPO Documents.  The February 2021 SPO Documents containing substantively the same statements as referenced in paragraphs 68-70, *supra*, regarding Opendoor's proprietary Algorithm, the data powering the Algorithm, the Algorithm's purported pricing accuracy, and the Algorithm's purported real-time reaction to macro- and micro-economic conditions.

73.     On March 4, 2021, Opendoor filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "2020 10-K").  The 2020 10-K contained substantively the same statements as referenced in paragraphs 68-70, *supra*, regarding Opendoor's proprietary Algorithm, the data powering the Algorithm, the Algorithm's purported pricing accuracy, and the Algorithm's purported real-time reaction to macro- and micro-economic conditions.

74.     Appended as exhibits to the 2020 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Exchange Act Individual Defendants certified that "[t]he [2020 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

75.   On September 15, 2021, the Company filed the September 2021 SPO Documents with the SEC.   The September 2021 SPO Documents contained substantively the same statements as referenced in paragraphs 68-70, *supra*, regarding Opendoor's proprietary Algorithm, the data powering the Algorithm, the Algorithm's purported pricing accuracy, and the Algorithm's purported real-time reaction to macro- and micro-economic conditions.

**Opendoor's Misrepresentations Begin to Come to Light As Opendoor Issues Further Materially False and Misleading Statements**

76.   On February 24, 2022, the Company announced that, despite its representations about the efficacy of its Algorithm, it was sustaining massive losses, which led to a significant drop in its stock price.   According to an article from *The Real Deal* dated February 25, 2022, this drop was widely attributed to a decline in Opendoor's contribution margin, which measures profitability while factoring in costs related to selling homes.   Therefore, the drop in stock price was attributable to the Company's failure to price homes at profitable levels, which began to reveal that the Algorithm was not working as the Company represented.

77.   On this news, Opendoor's stock price dropped $2.54, or ***23 percent***, to close at $8.44 on February 25, 2022.

78.   While Opendoor's misrepresentations were beginning to come to light, the Company continued to represent to investors that its Algorithm could profitably price homes.   On February 24, 2022, Opendoor filed an annual report on Form 10-K with the SEC, reporting the Company's financial results for the quarter and year ended December 31, 2021 (the "2021 10-K").   The 2021 10-K contained substantively the same statements as referenced in paragraph 70, *supra*, regarding the Algorithm's purported pricing accuracy and real-time reaction to macro- and micro-economic conditions.

79.   For instance, with respect to Opendoor's improvements to its proprietary offline data for the Algorithm, the 2021 10-K stated, in relevant part:

> We have conducted approximately 375,000 assessments during which we collect over 100 data points on each home and its surroundings. We have invested in building custom inspection and operator tooling to systematically source and translate home features into a robust data library. These proprietary data points have led us to make approximately 1.4 billion annotations and adjustments to MLS and tax assessor data, as well as build out unique geospatial data assets, such as power line proximity and road noise level. Once we list a home for resale, we collect additional home-level demand data such as home visits and visitor feedback, which enable us to continuously calibrate our resale strategy and acquisition home pricing.

80.    With respect to how Opendoor utilized the Algorithm to generate "Industry-Leading Pricing Capabilities", the 2021 10-K stated, *inter alia*:

> To create our home offers, we algorithmically produce both an estimated offer price and an assessment of our confidence level in that estimate, and we then further validate that estimate with in-depth underwriting and risk assessment, including additional review from our in-house pricing associates, to finalize the offer. We dynamically adjust our offers to account for the level of certainty in pricing each home. This degree of certainty can be impacted by factors such as macro conditions, the condition or attributes of a home, or depth of home comparables. ***We are constantly recalibrating our view of pricing and where market values are trending using high-frequency detailed metrics across all segments of our business, including numerous inputs related to the dynamics of market demand and supply across markets, home types and time periods.***

> (Emphasis added)

81.    The 2021 10-K also represented that Opendoor had implemented a "Robust Risk Management Framework," stating, *inter alia*:

> ***Since our inception, we have prioritized investment in our pricing capabilities across our home acquisition processes and our forecasting and resale systems, and expect to continue to do so.*** These investments pair with a strong risk management focus that is embedded in our pricing, finance and operations teams. We evaluate the quality of our pricing models and processes using high-frequency detailed metrics across all segments of our business, including home acquisition, resale strategy and inventory health. All of our pricing decisions are managed centrally, giving us a high degree of control over our overall growth and margin objectives.

> (Emphasis added)

82.   In addition, the 2021 10-K assured investors that "[w]hile residential real estate markets are subject to fluctuations, as with any market, we believe we are well-positioned to manage our risk exposure due to," among other things, Opendoor's "pricing models and inventory management systems [that] are designed to recalibrate to market signals on a daily basis."

83.   In this same vein, the 2021 10-K further represented, in relevant part:

> **[C]hanging market conditions are reflected in our pricing for new acquisitions, largely leaving previously-acquired inventory at risk to potential market volatility.** In addition, we employ sophisticated resale pricing management systems that allow us to optimize sell-through and margin using real-time, local market demand information, including down to an individual home level. We believe that the quality and scale of information we utilize in our inventory management decisions and our ability to manage these decisions across a scaled, diversified portfolio provides us with a structural advantage over individual sellers or agents in the traditional home selling process.

(Emphasis added)

84.   Appended as exhibits to the 2021 10-K were substantively the same SOX certifications as referenced in paragraph 74, *supra*, signed by the Exchange Act Individual Defendants.

85.   On August 4, 2022, after the markets closed, Opendoor issued a press release ("August 4 Press Release") announcing the Company's second quarter 2022 results including, among other things, third quarter 2022 adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") guidance of $(175) million to $(125) million.

86.   Notwithstanding the August 4 Press Release's disclosure that Opendoor could potentially lose as much as $175 million in adjusted EBITDA in the third quarter of 2022, Defendant Wu, as quoted in the August 4 Press Release, continued to reassure investors regarding the purported benefits of the Company's Algorithm, stating, in relevant part: "[C]urrent market volatility is requiring us to move swiftly and with discipline in managing risk and overall inventory health. ***We are leveraging our***

1    ***responsive pricing and operations platform . . . to operate from a position of strength***
2    ***and solidify our leadership as the category winner.***"  (Emphasis added)

3        87.    That same day, also after the markets closed, the Exchange Act Individual
4    Defendants issued a letter ("August 4 Letter") to shareholders indicating that "the
5    housing market has moved rapidly in response to the Fed's aggressive rate hikes in an
6    effort to curb inflation" and that "[t]his resulted in a steep increase in mortgage rates,
7    which in turn catalyzed a slowdown in the rate of home transactions and lower levels
8    of home price appreciation from all-time highs early in the year."

9        88.    The August 4 Letter, however, reassured Opendoor shareholders that
10   "[o]ur investments in our platform have enabled an agile and low cost operating system
11   ***that allows us to scale up and down gracefully across seasons and cycles***," and "[w]e
12   are ready and well-positioned with our responsive pricing strategies, flexible operating
13   model, low cost structure, and strong balance sheet ***to navigate near-term volatility*** and
14   invest in the future of our platform."  (Emphasis added.)

15       89.    On a conference call after the markets closed on August 4, 2022,
16   Defendant Wheeler reassured an analyst that even in the current volatile market "***our***
17   ***systems are doing exactly what they're designed to do, which is responding very, very***
18   ***quickly, adjusting prices to market*** and we've been raising spreads and new
19   acquisitions."  (Emphasis added.)

20       90.    On August 5, 2022, as a result of the Exchange Act Defendants' positive
21   representations, as referenced in paragraphs 86 and 88-89, *supra*, regarding the
22   Algorithm's ability to navigate recently observed volatility in the housing market,
23   Opendoor's stock price jumped 21.7 percent to close at $5.72 per share.

24       91.    The statements referenced in paragraphs 68-70, 72-75, 78-84, 86, and 88-
25   89 were materially false and misleading because Defendants made false and/or
26   misleading statements, as well as failed to disclose material adverse facts about the
27   Company's business, operations, and prospects.  Specifically, the Defendants made
28   false and/or misleading statements and/or failed to disclose that: (i) the Algorithm used

by the Company to make offers for homes could not accurately adjust to changing house prices across different market conditions and economic cycles; (ii) as a result, the Company was at an increased risk of sustaining significant and repeated losses due to residential real estate pricing fluctuations; (iii) accordingly, Defendants overstated the purported benefits and competitive advantages of the Algorithm; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

92.     Further, the undisclosed adverse facts and circumstances detailed above presented known trends, uncertainties, and risks that required disclosure in the Offering Documents.  Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required the Company to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure in the Offering Documents of "the material factors that ma[d]e an investment in [Opendoor] speculative or risky" and an explanation of "how [the] risk affect[ed] [Opendoor] or the securities being offered."  The Offering Documents failed to disclose material facts necessary to apprise common stock purchasers of the true risks inherent in investing in the Company in violation of Item 303 and Item 105.

93.     Specifically, Defendants failed to disclose that the Algorithm it used to make offers for homes could not accurately adjust to changing house prices across different market conditions and economic cycles and, as a result, the Company was at an increased risk of sustaining significant and repeated losses due to residential real estate pricing fluctuations.  The Company's failure to disclose these facts violated Item 303 because these undisclosed facts were known and would (and did) have an unfavorable impact on the Company's financial results.  The Company's failure to make these disclosures also violated Item 105, because these specific risks were not

adequately disclosed, even though they were significant factors making an investment in Opendoor's stock speculative or risky.

**The Truth Behind Opendoor's Misrepresentations Are Further Revealed**

94.     On September 19, 2022, citing a review of industry data, *Bloomberg* reported that the Company appeared to have lost money on 42 percent of its transactions in August 2022 (as measured by the prices at which it bought and sold properties), stating, in relevant part:

> [Opendoor], which sells thousands of homes in a typical month, lost money on 42% of its transactions in August, according to research from YipitData. Opendoor's performance — as measured by the prices at which it bought and sold properties — was even worse in key markets such as Los Angeles, where the company lost money on 55% of sales, and Phoenix, where the share was 76%.
>
> The losses, which don't include fees charged to customers or expenses incurred in renovating and marketing homes, have been looming since the housing market turned suddenly in recent months.
>
> *       *       *
>
> The company's rocky summer is reminiscent of the pricing problems that doomed Zillow Group Inc.'s iBuying business last year, according to a research note from Mike DelPrete, a scholar-in-residence at the University of Colorado Boulder. That doesn't mean Opendoor is going to shut down the business, but it demonstrates the depth of the losses — and September is likely to be even worse than August, DelPrete's analysis shows.
>
> Opendoor's metrics are in the danger zone," DelPrete said in an interview. "They are very close to where Zillow was in its worst moments."
>
> The iBuying model relies on acquiring homes, making light repairs and reselling the properties — often within a few months of the initial purchase. When home prices were skyrocketing earlier in the year, Opendoor banked easy profits. Then dwindling affordability and mortgage rates soaring toward 6% this spring finally pushed would-be buyers to the sidelines.
>
> By June, median home prices had begun to decline in some areas, especially the Sun Belt markets that had been frothiest in the pandemic boom days. The shift caught Opendoor by surprise, leaving it to offload thousands of

> properties it had agreed to purchase when prices were rising.
>
> * * *
>
> The shares slid 4.7% to $3.87 at 3:28 p.m. New York time Monday. They were down 72% this year through the close on Sept. 16.

*Bloomberg's* findings evidenced the failure of Opendoor's Algorithm to adjust accurately to changing market conditions.

95.    Following the *Bloomberg* report, Opendoor's stock price fell $0.50 per share, or 12.32 percent, over the following two trading sessions, to close at $3.56 per share on September 20, 2022.

96.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**Additional Scienter Allegations Related to Exchange Act Claims**

97.    During the Class Period, as alleged herein, the Exchange Act Individual Defendants acted with scienter in that the Exchange Act Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

98.    The Exchange Act Individual Defendants permitted Opendoor to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's securities.

99.    As set forth herein, the Exchange Act Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Opendoor, their control over, receipt, or modification of Opendoor's allegedly materially misleading

statements and omissions, or their positions with the Company that made them privy to confidential information concerning Opendoor, participated in the fraudulent scheme alleged herein.

100.   The Exchange Act Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Opendoor securities by disseminating materially false and misleading statements or concealing material adverse facts.  The scheme deceived the investing public regarding Opendoor's business, operations, and management and the intrinsic value of Opendoor securities and caused Plaintiffs and members of the Class to purchase Opendoor securities at artificially inflated prices.

**Loss Causation/Economic Loss**

101.   During the Class Period, as detailed herein, Opendoor and the Exchange Act Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Opendoor securities and operated as a fraud or deceit on Class Period purchasers of Opendoor securities by misrepresenting the Company's business and prospects.  Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of Opendoor securities declined as the prior artificial inflation came out of the price over time.  As a result of their purchases of Opendoor securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

**Applicability of Presumption of Reliance: Fraud on the Market**

102.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Opendoor securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Opendoor securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

103.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

104.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**No Safe Harbor**

105.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially

false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Opendoor who knew that the statement was false when made.

## COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants**

106.   Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein.

107.   This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule l0b-5 promulgated thereunder by the SEC.

108.   During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Opendoor securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Opendoor securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

109.   Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements

made to securities analysts and the media that were designed to influence the market for Opendoor securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Opendoor's finances and business prospects.

110. By virtue of their positions at Opendoor, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants. Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

111. Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control. As the senior managers and/or directors of Opendoor, the Exchange Act Individual Defendants had knowledge of the details of Opendoor's internal affairs.

112. The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Opendoor. As officers and/or directors of a publicly held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Opendoor's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports,

releases and public statements, the market price of Opendoor securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Opendoor's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Opendoor securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

113.   During the Class Period, Opendoor securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Opendoor securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Opendoor securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Opendoor securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

114.   By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

115.   As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Exchange Act Individual Defendants

116.   Plaintiffs repeat and incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

117.   During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of Opendoor, and conducted and participated, directly and indirectly, in the conduct of Opendoor's business affairs. Because of their senior positions, they knew the adverse non-public information about Opendoor's misstatement of income and expenses and false financial statements.

118.   As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Opendoor's financial condition and results of operations, and to correct promptly any public statements issued by Opendoor which had become materially false or misleading.

119.   Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Opendoor disseminated in the marketplace during the Class Period concerning Opendoor's results of operations. Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Opendoor to engage in the wrongful acts complained of herein.   The Exchange Act Individual Defendants, therefore, were "controlling persons" of Opendoor within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Opendoor securities.

120.   Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Opendoor.   By reason of their senior management positions and/or being directors of Opendoor, each of the Exchange Act Individual Defendants

had the power to direct the actions of, and exercised the same to cause, Opendoor to engage in the unlawful acts and conduct complained of herein.  Each of the Exchange Act Individual Defendants exercised control over the general operations of Opendoor and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

121.   By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Opendoor.

## SUBSTANTIVE ALLEGATIONS – SECURITIES ACT CLAIMS

**Materially False and Misleading Statements Issued in the December 2020 Offering Documents**

122.   The Securities Act claims in this case relate to false and misleading statements issued in the December 2020 Offering Documents, the February 2021 SPO Documents, and the September 2021 Documents.

123.   The December 2020 Offering Documents stated the following regarding Legacy Opendoor's—and, following the Merger, the Company's—proprietary Algorithm:

> While the real estate industry lends itself to the use of a plethora of publicly sourceable data, much of this data lacks the quality and specificity essential to accurately price homes. Since Opendoor's founding, we have built world-class data science capabilities and systematized tooling to gather, aggregate and synthesize an expanding catalogue of proprietary, hyperlocal data in order to improve and automate pricing decisions.

124.   With respect to the proprietary offline data used by the Algorithm, the December 2020 Offering Documents stated, in relevant part:

> We have conducted over 150,000 home assessments during which we collect over 100 data points on each home and its surroundings. We have invested in building custom inspection and operator tooling to systematically source and translate home features into a robust data library. Once we have purchased a home, we can collect additional proprietary home-level data through visitor feedback, visitor traffic and duration of visits. These proprietary data points have led us to make over one billion annotations and

corrections to Multiple Listing Services ("MLS") and tax assessor data, as well as build out new, non-traditional geospatial data assets, such as power line proximity and road noise level. The additional home level data we collect from local vendors provides structured feedback on each home and further strengthens our data moat.

125.   With respect to the "pricing accuracy" of the Algorithm and its purported real-time reaction time to macro- and micro-economic conditions, the December 2020 Offering Documents stated, in relevant part:

Our unique data works in concert with our pricing algorithms. These algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and inventory management. Over time, we have improved the pricing accuracy of our models as we add new data inputs and refine model logic, improvements that compound with experience and scale. As we have continued to demonstrate improving accuracy, we have also been able to increase our number of fully automated home valuations.

Advancements in model sophistication have accelerated our feedback loops, such that our systems can dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions. Our pricing algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions. This responsiveness is critical to pricing accurately and maintaining margins, especially in periods of volatility.

126.   Opendoor's post-Merger common stock began publicly trading on the NASDAQ on December 21, 2020 pursuant to the materially false and misleading statements and omissions contained in the December 2020 Offering Documents.

**Materially False and Misleading Statements in the February 2021 SPO Documents**

127.   On February 4, 2021, the Company filed with the SEC the February 2021 SPO Documents.   The February 2021 SPO Documents contained substantively the same statements as referenced in paragraphs 123-125, *supra*, regarding Opendoor's proprietary Algorithm, the data powering the Algorithm, the Algorithm's purported pricing accuracy, and the Algorithm's purported real-time reaction to macro- and micro-economic conditions.

**Materially False and Misleading Statements in the September 2021 SPO Documents**

128.   Opendoor continued to assure investors that that it's Algorithm could price properties accurately in the face of a shifting real-estate market ahead of its next SPO.  For instance, on September 15, 2021, the Company filed the September 2021 SPO Documents with the SEC.  The September 2021 SPO Documents contained substantively the same statements as referenced in paragraphs 123-125, *supra*, regarding Opendoor's proprietary Algorithm, the data powering the Algorithm, the Algorithm's purported pricing accuracy, and the Algorithm's purported real-time reaction to macro- and micro-economic conditions.

**Statements in the Offering Documents Were Materially False and Misleading**

129.   The statements referenced in paragraphs 123-125, 127, and 128 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Offering Documents contained false and/or misleading statements and/or failed to disclose that: (i) the Algorithm used by the Company to make offers for homes could not accurately adjust to changing house prices across different market conditions and economic cycles; (ii) as a result, the Company was at an increased risk of sustaining significant and repeated losses due to residential real estate pricing fluctuations; (iii) accordingly, Defendants overstated the purported benefits and competitive advantages of the Algorithm; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

130.   Further, the undisclosed adverse facts and circumstances detailed above presented known trends, uncertainties, and risks that required disclosure in the Offering Documents.  Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required the Company to disclose "any known trends or uncertainties that have

had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure in the Offering Documents of "the material factors that ma[d]e an investment in [Opendoor] speculative or risky" and an explanation of "how [the] risk affect[ed] [Opendoor] or the securities being offered."  The Offering Documents failed to disclose material facts necessary to apprise common stock purchasers of the true risks inherent in investing in the Company in violation of Item 303 and Item 105.

131.   Specifically, Defendants failed to disclose that the Algorithm it used to make offers for homes could not accurately adjust to changing house prices across different market conditions and economic cycles and, as a result, the Company was at an increased risk of sustaining significant and repeated losses due to residential real estate pricing fluctuations.  The Company's failure to disclose these facts violated Item 303 because these undisclosed facts were known and would (and did) have an unfavorable impact on the Company's financial results.  The Company's failure to make these disclosures also violated Item 105, because these specific risks were not adequately disclosed, even though they were significant factors making an investment in Opendoor's stock speculative or risky.

**The Falsity of Opendoor's Misrepresentations Begin to Come to Light in February of 2022**

132.   Massive financial losses, revealed by the Company on February 24, 2022, led to a large drop in Opendoor's stock price.  According to an article from *The Real Deal* dated February 25, 2022, this decline was widely attributed to a decline in Opendoor's contribution margin, which measures profitability while factoring in costs related to selling homes.  Therefore, the stock price drop was attributable to the Company's failure to price homes at profitable levels.

**Material Misrepresentations and Omissions Contained in the Offering Documents Were Further Revealed in September of 2022**

133.    On September 19, 2022, citing a review of industry data, *Bloomberg* reported that the Company appeared to have lost money on 42 percent of its transactions in August 2022 (as measured by the prices at which it bought and sold properties), stating, in relevant part:

> [Opendoor], which sells thousands of homes in a typical month, lost money on 42% of its transactions in August, according to research from YipitData. Opendoor's performance — as measured by the prices at which it bought and sold properties — was even worse in key markets such as Los Angeles, where the company lost money on 55% of sales, and Phoenix, where the share was 76%.

> The losses, which don't include fees charged to customers or expenses incurred in renovating and marketing homes, have been looming since the housing market turned suddenly in recent months.

> * * *

> The company's rocky summer is reminiscent of the pricing problems that doomed Zillow Group Inc.'s iBuying business last year, according to a research note from Mike DelPrete, a scholar-in-residence at the University of Colorado Boulder. That doesn't mean Opendoor is going to shut down the business, but it demonstrates the depth of the losses — and September is likely to be even worse than August, DelPrete's analysis shows.

> Opendoor's metrics are in the danger zone," DelPrete said in an interview. "They are very close to where Zillow was in its worst moments."

> The iBuying model relies on acquiring homes, making light repairs and reselling the properties — often within a few months of the initial purchase. When home prices were skyrocketing earlier in the year, Opendoor banked easy profits. Then dwindling affordability and mortgage rates soaring toward 6% this spring finally pushed would-be buyers to the sidelines.

> By June, median home prices had begun to decline in some areas, especially the Sun Belt markets that had been frothiest in the pandemic boom days. The shift caught Opendoor by surprise, leaving it to offload thousands of properties it had agreed to purchase when prices were rising.

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                                                33

* * *

> The shares slid 4.7% to $3.87 at 3:28 p.m. New York time Monday. They were down 72% this year through the close on Sept. 16.

*Bloomberg's* findings evidenced the failure of Opendoor's Algorithm to adjust accurately to changing market conditions.

134.   Following the revelations in February of 2022, Opendoor's common stock price fell $2.54, or 23 percent, to close at $8.44 on February 25, 2022.  Following the September 19, 2022 *Bloomberg* report, Opendoor's stock price fell $0.50 per share, or 12.32 percent, over the following two trading sessions, to close at $3.56 per share on September 20, 2022-an ***88.61 percent*** decline from the Initial Closing Price.

135.   As of the time this Complaint was filed, Opendoor's common stock was trading significantly below the Initial Closing Price and continues to trade below its initial value from the Merger, damaging investors.

136.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## COUNT III

### For Violations of Section 11 of the Securities Act
### Against Opendoor, the Securities Act Individual Defendants, and the Underwriter Defendants

137.   Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

138.   This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants.

139.   The Offering Documents were inaccurate and misleading or contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

140.   Opendoor is the registrant for the Merger and the SPOs.  Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

141.   As issuer of the shares, Opendoor is strictly liable to Plaintiffs and the Class for the misstatements and omissions in the Offering Documents.

142.   None of the Defendants named herein made a reasonable investigation of or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

143.   By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

144.   Plaintiffs acquired Opendoor shares pursuant and/or traceable to the Offering Documents.

145.   Plaintiffs and the Class have sustained damages.  The value of Opendoor common stock has declined substantially subsequent to and because of Defendants' violations.

## **COUNT IV**

**For Violations of Section 12(a)(2) of the Securities Act Against Opendoor, the SPO Individual Defendants, SVF, and the Underwriter Defendants**

146.   Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

147.   This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class, against Opendoor, the Securities Act Individual Defendants, SVF, and the Underwriter Defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 12(a)(2), and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

148.   Each of the Defendants named in this Count were sellers, offerors, or solicitors of purchases of the Company's common stock pursuant to the defective prospectuses which respectively formed in relevant part the February 2021 SPO Documents and the September 2021 SPO Documents.  The actions of solicitation by the Securities Act Defendants include participating in the preparation of the false and misleading prospectuses and marketing the common stock to investors, including members of the Class.

149.   The prospectuses contained untrue statements of material fact, omitted to state other facts necessary to make statements made therein not misleading, and omitted to state material facts required to be stated therein.

150.   Each of the Defendants named in this Count owed members of the Class who purchased or otherwise acquired Opendoor common stock pursuant to the prospectuses issued in connection with the SPOs a duty to make a reasonable and diligent investigation of the statements contained in the prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. By virtue of each of the Defendants named in this Count's failure to exercise reasonable care, the prospectuses contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.

151.   Members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the prospectuses issued in connection with SPOs at the time they purchased or otherwise acquired Opendoor common stock.

152.   By reason of the conduct alleged herein, the Securities Act Defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, members of the Class who purchased or otherwise acquired Opendoor common stock pursuant to the prospectuses issued in connection with the SPOs sustained substantial damages in connection therewith.  Accordingly, members of the

Class who hold the common stock issued pursuant to the prospectuses issued in connection with the SPOs have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity. Class members who have sold their Opendoor common stock seek damages to the extent permitted by law.

153. Less than one year has elapsed from the time that Plaintiffs discovered, or reasonably could have discovered, the facts upon which this complaint is based to the time that Plaintiffs filed this action. Less than three years has elapsed between the time that the securities upon which this count is brought were offered to the public and the time Plaintiffs filed this action.

## COUNT V

### For Violations of Section 15 of the Securities Act
### Against the Securities Act Individual Defendants,

154. Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

155. This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

156. The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Opendoor within the meaning of Section 15 of the Securities Act. The Securities Act Individual Defendants had the power and influence and exercised the same to cause Opendoor to engage in the acts described herein.

157. The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

158.   By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

159.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Opendoor securities during the Class Period, and/or Opendoor common stock pursuant and/or traceable to the Offering Documents; and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

160.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Opendoor securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Opendoor or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

161.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

162.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

163.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the December 2020 Offering Documents for the Merger, or during the Class Period, misrepresented material facts about the business, operations and management of Opendoor;

- whether the Securities Act Individual Defendants negligently prepared the December 2020 Offering Documents for the Merger and, as a result, the December 2020 Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation;

- whether the Exchange Act Individual Defendants caused Opendoor to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Opendoor securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

164.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: November 22, 2022                   Respectfully submitted,

**LABATON SUCHAROW LLP**


By: /s/ *Francis P. McConville*
Francis P. McConville
*(pro hac vice forthcoming)*
Guillaume Buell
*(pro hac vice forthcoming)*
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
fmcconville@labaton.com
gbuell@labaton.com

**VANOVERBEKE MICHAUD & TIMMONY P.C.**

/s/ *Aaron L. Castle*
Aaron L. Castle
*(pro hac vice forthcoming)*
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
acastle@vmtlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATION

I, Joseph Rozell, as Chairman of Oakland County VEBA, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Oakland County VEBA.  I have reviewed a complaint prepared against Opendoor Technologies Inc. ("Opendoor") alleging violations of the federal securities laws, and authorize the filing of this pleading;

2.      Oakland County VEBA did not purchase securities of Opendoor at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Oakland County VEBA is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  Oakland County VEBA fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      Oakland Country VEBA's transactions in Opendoor securities during the Class Period are reflected in Exhibit A, attached hereto;

5.      Oakland County VEBA sought to serve or currently serves as a lead plaintiff in the following class actions under the federal securities laws filed during the last three years:

> *In re Grand Canyon Education, Inc., Sec. Litig.,* No. 1:20-cv-00639 (D. Del.)
> *Building Trades Pension Fund of Western Pennsylvania v. Insperity, Inc.,*
> No. 1:20-cv-5635 (S.D.N.Y.)
> *City of Hollywood Police Officers Retirement System v. Citrix Systems, Inc.,*
> No. 0:21-cv-62380 (S.D. Fla.)

6.      Beyond its pro rata share of any recovery, Oakland County VEBA will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 21st day of November, 2022.

Joseph Rozell
Chairman
Oakland County VEBA

EXHIBIT A

## TRANSACTIONS IN OPENDOOR TECHNOLOGIES INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchases | 2/5/2021 | 5,763 | $27.00 | ($155,601.00) |
| Sales | 1/27/2022 | -1,200 | $8.50 | $10,200.00 |
| Sales | 8/11/2022 | -167 | $5.99 | $1,000.75 |
| Sales | 8/11/2022 | -974 | $5.95 | $5,799.98 |
| Sales | 8/12/2022 | -24 | $6.29 | $150.95 |
| Sales | 8/12/2022 | -11 | $6.26 | $68.91 |
| Sales | 8/12/2022 | -224 | $6.09 | $1,364.97 |
| Sales | 8/12/2022 | -4 | $6.29 | $25.14 |
| Sales | 8/12/2022 | -513 | $6.28 | $3,220.31 |
| Sales | 8/15/2022 | -11 | $6.04 | $66.39 |
| Sales | 8/15/2022 | -342 | $6.02 | $2,060.14 |
| Sales | 8/16/2022 | -689 | $5.73 | $3,947.69 |
| Sales | 8/17/2022 | -227 | $5.25 | $1,191.93 |
| Sales | 8/18/2022 | -172 | $4.99 | $858.54 |
| Sales | 8/18/2022 | -74 | $4.95 | $366.60 |
| Sales | 8/18/2022 | -864 | $5.04 | $4,351.19 |
| Sales | 8/18/2022 | -110 | $5.10 | $560.45 |
| Sales | 8/18/2022 | -157 | $4.94 | $774.80 |

## **CERTIFICATION**

I, Joseph Rozell, as Chairman of Oakland County Employees' Retirement System ("Oakland County ERS"), hereby certify as follows:

1.       I am fully authorized to enter into and execute this Certification on behalf of Oakland County ERS.  I have reviewed a complaint prepared against Opendoor Technologies Inc. ("Opendoor") alleging violations of the federal securities laws, and authorize the filing of this pleading;

2.       Oakland County ERS did not purchase securities of Opendoor at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.       Oakland County ERS is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  Oakland County ERS fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.       Oakland Country ERS' transactions in Opendoor securities during the Class Period are reflected in Exhibit A, attached hereto;

5.       Oakland County ERS sought to serve or currently serves as a lead plaintiff in the following class actions under the federal securities laws filed during the last three years:

> *In re Grand Canyon Education, Inc.*, Sec. Litig., No. 1:20-cv-00639 (D. Del.)
> *Building Trades Pension Fund of Western Pennsylvania v. Insperity, Inc.*,
> No. 1:20-cv-5635 (S.D.N.Y.)
> *City of Hollywood Police Officers Retirement System v. Citrix Systems*, Inc.,
> No. 0:21-cv-62380 (S.D. Fla.)

6.       Beyond its pro rata share of any recovery, Oakland County ERS will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _21st_ day of November, 2022.

Joseph Rozell
Chairman
Oakland County Employees'
Retirement System

EXHIBIT A

## TRANSACTIONS IN OPENDOOR TECHNOLOGIES INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchases | 2/5/2021 | 2,994 | $27.00 | ($80,838.00) |
| Sales | 8/2/2021 | -363 | $14.96 | $5,430.48 |
| Sales | 3/24/2022 | -627 | $9.03 | $5,661.81 |
| Sales | 8/11/2022 | -73 | $5.99 | $437.45 |
| Sales | 8/11/2022 | -428 | $5.95 | $2,548.65 |
| Sales | 8/12/2022 | -98 | $6.09 | $597.17 |
| Sales | 8/12/2022 | -5 | $6.26 | $31.32 |
| Sales | 8/12/2022 | -226 | $6.28 | $1,418.69 |
| Sales | 8/12/2022 | -2 | $6.29 | $12.57 |
| Sales | 8/12/2022 | -10 | $6.29 | $62.89 |
| Sales | 8/15/2022 | -5 | $6.04 | $30.18 |
| Sales | 8/15/2022 | -150 | $6.02 | $903.57 |
| Sales | 8/16/2022 | -303 | $5.73 | $1,736.07 |
| Sales | 8/17/2022 | -100 | $5.25 | $525.08 |
| Sales | 8/18/2022 | -48 | $5.10 | $244.56 |
| Sales | 8/18/2022 | -379 | $5.04 | $1,908.68 |
| Sales | 8/18/2022 | -68 | $4.94 | $335.58 |
| Sales | 8/18/2022 | -76 | $4.99 | $379.35 |
| Sales | 8/18/2022 | -33 | $4.95 | $163.49 |